**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**RONALD McGILVERY, JR.,**

    **Plaintiff,**

vs.                                                               Case No.: 8:12-CV-1933-T-27EAJ

**CAROLYN W. COLVIN**
**Commissioner of Social**
**Security Administration,**[1]

    **Defendant.**
_____/

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to the Social Security Act ("the Act"), as amended, Title 42, United States Code, Sections 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

After reviewing the record, including a transcript of the proceedings before the Administrative Law Judge ("ALJ"), the administrative record, and the pleadings and memoranda submitted by the parties in this case, the Court recommends affirming the Commissioner's decision and dismissing this case.[2]

In an action for judicial review, the reviewing court must affirm the decision of the Commissioner if it is supported by substantial evidence in the record as a whole and comports with

---

[1] The current acting Commissioner of Social Security, Carolyn W. Colvin, is substituted for Michael J. Astrue, former Commissioner of Social Security. See Fed. R. Civ. P. 25(d).

[2] The district judge referred this matter to the undersigned for consideration and a Report and Recommendation. See Local Rule 6.01(a), M.D. Fla.

applicable legal standards. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). If there is substantial evidence to support the Commissioner's findings, the reviewing court may not decide the facts anew or substitute its judgment as to the weight of the evidence for that of the Commissioner. See Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979).

If the Commissioner committed an error of law, the case must be remanded to the Commissioner for application of the correct legal standard. See Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). If the reviewing court is unable to determine from the Commissioner's decision that the proper legal standards were applied, then remand to the Commissioner for clarification is required. See Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).

## I. Background

On July 8, 2009, Plaintiff filed applications for DIB and SSI, alleging disability beginning August 15, 2007 in both applications. (T 25, 151, 158) Plaintiff's applications were denied initially and upon reconsideration, and an administrative hearing was held on June 9, 2011. (T 25, 46) Forty-six years old at the time of the hearing, Plaintiff has a high school education and past relevant work as an electrician's helper, coach wirer, auction material handler, auction assistant, window installer, and machine operator. (T 37, 49, 78, 204)

On July 25, 2011, the ALJ denied Plaintiff's claims. (T 38) Although Plaintiff's severe impairments included probable post-traumatic arthritis of the back, headaches, bipolar disorder, and a history of substance abuse, the ALJ determined that these impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1. (T 27, 29) The ALJ

concluded that Plaintiff had the residual functional capacity ("RFC") to perform a reduced range of light work subject to the following limitations: Plaintiff cannot climb ladders, ropes, and scaffolds, but he may frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (T 31) Plaintiff must avoid concentrated exposure to hazardous machinery or heights and take work breaks every two hours. (Id.) Additionally, Plaintiff is limited to jobs with no more than occasional interaction with the public of a superficial or casual nature and where confrontation is not likely. (Id.) Plaintiff is capable of understanding, carrying out, and remembering instructions and performing tasks at the unskilled to semi-skilled level. (Id.) Similarly, he is capable of handling work-related decisions and changes in an unskilled or semi-skilled work environment, with no fast-paced production rate assembly line work. (Id.)

Although Plaintiff was unable to perform any past relevant work, the ALJ found Plaintiff capable of performing other jobs available in significant numbers in the national economy, such as an office helper, photocopy operator, cleaner/housekeeper, and sorter. (T 37-38) Accordingly, the ALJ concluded that Plaintiff was not disabled during the relevant period. (T 38) On June 26, 2012, the Appeals Council denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (T 1-6)

The medical and other evidence has been reviewed in the ALJ's decision and will not be repeated here except as necessary to address the issues presented.

## II. Analysis

Plaintiff argues that the ALJ erred by failing to: (1) assign proper weight to the opinions of treating physician Joel Gleason, M.D. ("Dr. Gleason"); (2) appropriately evaluate Plaintiff's credibility; and (3) pose a hypothetical to the vocational expert ("VE") that included all of Plaintiff's limitations.

3

**A.** Plaintiff claims the ALJ inappropriately assigned "some, but not full weight, and not controlling weight" to the opinions of Dr. Gleason while according "great weight" to the opinions of non-examining psychologist James Levasseur, Ph.D. ("Dr. Levasseur") (T 36).

An ALJ generally must give a treating physician's medical opinions substantial or considerable weight. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). However, upon a showing of good cause, an ALJ may disregard a treating physician's opinion as long as the ALJ "clearly articulate[s] [the] reasons for doing so." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Good cause exists when: "(1) the treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Id. at 1241.

Yet it is not improper for an ALJ to consider the reports of consulting physicians, as long as the opinion of the treating physician is assigned proper weight. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986) (per curiam). If the ALJ articulates good cause for discrediting a treating physician's opinions, the ALJ is entitled to rely on a non-examining physician's opinion when it is consistent with the medical record and underlying clinical findings of the treating and examining physicians. Flowers v. Comm'r of Soc. Sec., 441 F. App'x 735, 742-43 (11th Cir. 2011) (per curiam) (unpublished).[3] Moreover, if the evidence supports a finding that is contrary to the opinion of a treating physician, "the ALJ [is] not prohibited from reaching that conclusion simply because non-treating physicians also reached it." Forrester v. Comm'r of Soc. Sec., 455 F. App'x 899, 902-03 (11th Cir. 2012) (unpublished) (per curiam) (citation omitted).

Dr. Gleason began treating Plaintiff at Suncoast Center for Community Mental Health in

---

[3] While not binding precedent, unpublished opinions of the Eleventh Circuit Court of Appeals may be cited as persuasive authority. 11th Cir. R. 36-2.

4

September 2009 for complaints including hearing voices, anger, and depression. (T 348) On September 27, 2010, Dr. Gleason completed a Psychiatric Impairment Questionnaire listing Plaintiff's diagnoses as: bipolar mood disorder not otherwise specified, most recent episode depressed with psychotic features;[4] posttraumatic stress disorder; and alcohol, marijuana, and cocaine abuse in remission. (T 414)  Plaintiff's symptoms included:  sleep disturbance, delusions or hallucinations, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, and hostility and irritability. (Id.) Dr. Gleason concluded that Plaintiff had slight restrictions in activities of daily living and moderate difficulties in social functioning. (T 416)   He opined that Plaintiff's impairments would cause him to miss work more than twice a month. (T 415)  Dr. Gleason also found that Plaintiff often suffered deficiencies in concentration, persistence, or pace that resulted in the inability to complete tasks in a timely manner and had repeated episodes of decompensation in work or work-like settings. (T 416)

On February 2, 2010, Dr. Levasseur reviewed Plaintiff's records and completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique. (T 370-86)   He found that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation. (T 384)  Dr. Levasseur noted that Plaintiff could be argumentative and reported losing a job due to problems with social interaction. (T 386)  Overall, however, Dr. Levasseur found Plaintiff had a normal appearance, cooperated with others, carried on normal conversations, and did not demonstrate extremes in behavior. (Id.)   Dr. Levasseur

---

[4] Bipolar disorder not otherwise specified ("NOS") "includes disorders with bipolar features that do not meet criteria for any specific Bipolar Disorder."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 400 (4th ed. 2000).

concluded that Plaintiff had "some reduction" in concentration that would affect pace and persistence occasionally but "not at a level that would significantly limit [Plaintiff's] productivity." (T 372)

The ALJ gave "great weight" to Dr. Levasseur's conclusions that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning, concentration, and persistence and pace; and no episodes of decompensation. (T 35-36) He also credited Dr. Gleason's findings that Plaintiff had slight restrictions in activities of daily living, moderate difficulties in social functioning, and often had deficiencies of concentration, persistence, and pace. (T 36) However, explaining that they were not supported by the record, the ALJ rejected Dr. Gleason's conclusions that Plaintiff experienced repeated episodes of decompensation and would be absent from work more than two times a month. (T 35-36)

In Plaintiff's view, Dr. Gleason's findings were not contradicted by other evidence of record because a non-examining psychologist's opinion is insufficient to override the opinion of a treating physician. Plaintiff also argues that Dr. Levasseur did not have a complete record at the time of his February 2010 review. (Dkt. 11 at 15) Lastly, Plaintiff states that even if Dr. Gleason's findings were not due controlling weight, the ALJ still failed to consider certain factors as required in evaluating a treating physician's opinion. (Id. at 16)

**1. Repeated episodes of decompensation**

Decompensation refers to "temporary increases in symptoms . . . accompanied by a loss of adaptive functioning[.]" 20 C.F.R. Part 404, Subpart P, App. 1 § 12.00(C)(4). Repeated episodes of decompensation, each of extended duration, are defined as three episodes of decompensation within one year, or an average of once every four months, with each episode lasting a minimum of

two weeks. Id. Episodes of decompensation can be inferred from:

> medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

Id.

The ALJ found that Plaintiff did not experience repeated episodes of decompensation because "these periods are supposed to be of extended duration, and there is only one crisis unit stay over the course of many years, for example." (T 35) Plaintiff interprets this statement as signifying that the ALJ incorrectly required a hospital stay to establish an episode of decompensation. Arguing that hospitalizations are not necessary, Plaintiff contends that his repeated episodes of decompensation are evidenced by changes to his medication and cites to treatment notes from five occasions in support. (Dkt. 11 at 13)

On June 24, 2009, Plaintiff was involuntarily hospitalized after arguing with his girlfriend, making threats, and frightening his nine-year-old child. (T 305) Reporting previous treatment for depression, Plaintiff denied suicidal or homicidal ideation. (Id.) He was not taking any medications at the time. (Id.) Plaintiff appeared alert and lucid, although his insight and judgment were deemed "limited." (Id.) He was diagnosed with adjustment disorder, discharged on June 29, 2013, and referred to outpatient services. (T 304-05, 307)

On September 16, 2009, Plaintiff had his initial evaluation with Dr. Gleason. (T 348-50) Plaintiff stated that he wanted to continue taking Paxil and Risperdal, which had been started during his June 2009 hospitalization, because the medications helped stabilize his mood and prevent hallucinations. (T 350) Dr. Gleason added Seroquel to address bipolar depression and more fully

7

stop the hallucinations. (Id.)

In a November 30, 2009 visit with Dr. Gleason, Plaintiff reported that his medicines were not working as well as they had in the past and complained of increased depression and auditory hallucinations. (T 346)   He told Dr. Gleason that the voices were instructing him to hurt other people and to hurt himself, but Plaintiff stated that he would not act on these commands. (Id.)  Dr. Gleason determined that Plaintiff was not in immediate danger to himself or others and increased his nightly dose of Seroquel from 150 mg to 400 mg, noting that the increased dosage should alleviate Plaintiff's depression and prevent hallucinations. (Id.)   Dr. Gleason found Plaintiff's speech normal in rate and volume and his thought processes logical. (Id.)   Plaintiff was alert and made good eye contact; however, Dr. Gleason stated that Plaintiff was suffering from paranoid delusions that others wanted to harm him. (Id.)

Although Plaintiff reported that he was taking his medications as directed on February 8, 2010, Dr. Gleason suspected that Plaintiff was not fully compliant. (T 396) Plaintiff complained that the increased dose of Seroquel made him too tired, and Dr. Gleason substituted the medication Invega for the Risperdal and Seroquel, explaining that he wanted to make "things as simple as possible" for Plaintiff to ensure compliance. (Id.) Plaintiff was alert with good eye contact; oriented to time, place, and person; denied suicidal ideation; and exhibited normal speech in volume and rate. He had auditory hallucinations and paranoid delusions that others wanted to harm him. (Id.)

On March 8, 2011, treatment notes show that Plaintiff was feeling "a little down" and experiencing loss of interest but that his depression and hopelessness were not as severe. (T 421) His appetite was average, and Plaintiff was sleeping a lot but explained that it was "by choice." (Id.) He reported that his auditory hallucinations were diminishing and thoughts of suicide had dissipated.

8

(Id.) No changes were made to his existing medication regimen of Paxil, BuSpar, and Invega. (Id.) He denied any side effects. (Id.)

In his opinion, the ALJ acknowledged that Plaintiff suffered "one to two episodes of decompensation, each of extended duration." (T 30) The June 2009 hospitalization was one episode (T 35), and even though records were unavailable, the ALJ considered Plaintiff's self-report of a 2001 psychiatric hospitalization as another "possible" episode (T 30). Nonetheless, given that a minimum of three episodes are required, the ALJ properly found that Plaintiff had not experienced "repeated" episodes of decompensation. (Id.) The ALJ further explained that the record did not show decompensation of extended duration, noting only one crisis unit stay during a period of many years. (T 35) The ALJ did not err in referencing the crisis unit stay, as in-patient treatment is an appropriate indication of an episode of decompensation of extended duration. See 20 C.F.R. Part 404, Subpart P, App. 1 § 12.00(C)(4).

Nor did the ALJ overlook other evidence. The ALJ extensively discussed Plaintiff's treatment history, chronicling his visits with Dr. Gleason and noting that Plaintiff's medication was increased around November 2009 after he reported "command hallucinations." (T 35) Yet the ALJ observed that Plaintiff experienced significant improvement in his symptoms over time from medication alone, despite recommendations that he should also undergo therapy. (T 35-36) In particular, Plaintiff showed consistent progress after he started taking the medication Invega, with generally good reports from April 2010 through August 2010. (T 35) The ALJ observed that Plaintiff's mental status was very good in August 2010, when Plaintiff was not experiencing any side effects and wanted to continue the same medications because they had been effective for him. (T 35, 391)   In that same time period, Plaintiff worked with the Department of Vocational

Rehabilitation and took a course in computer skills. (T 35, 60, 390) In March 2011, Plaintiff was feeling a little down, but his depression and hopelessness were not as severe. (T 34, 421) He reported that the voices had diminished, and he no longer had thoughts of suicide. (Id.)

Moreover, Plaintiff's citations to treatment notes involving his medications do not establish repeated episodes of decompensation. Plaintiff refers to the June 2009 hospitalization, but the ALJ already acknowledged that this crisis unit admission was an episode of decompensation. On September 16, 2009, Dr. Gleason added Seroquel to Plaintiff's medications to augment the improvements that were already under way, not because Plaintiff was experiencing a resurgence of symptoms. (T 350) In November 2009, Dr. Gleason increased Plaintiff's dosage of Seroquel to address his depression and hallucinations, as well as to help him sleep better. (T 346) Yet Dr. Gleason's notes from that visit do not indicate that Plaintiff was suffering from the loss of adaptive function that indicates decompensation, as Plaintiff was alert and oriented to time, place, and person. (Id.) His grooming was fair, and he made good eye contact. (Id.) He denied suicidal or homicidal ideation, and his speech was normal in rate and volume. (Id.) In February 2010, Dr. Gleason substituted Invega for Risperdal and Seroquel to streamline Plaintiff's treatment and increase compliance. (T 396) In March 2011, Plaintiff generally reported improvements in his symptoms, and his medications were refilled without alteration. (T 421)

Under the regulations, changes in medication must be significant to indicate decompensation; however, the records cited do not rise to that level as they mostly refer to adjustments intended to bolster improvements or assist in compliance and do not document loss in adaptive function. As such, Plaintiff's contention that his medication changes establish repeated episodes of decompensation is not persausive.

**2. Absences from work**

Plaintiff also contends that the ALJ inappropriately rejected Dr. Gleason's determination that Plaintiff's mental impairments would cause him to be absent from work more than twice a month.

The ALJ found this conclusion inconsistent with Dr. Gleason's own treatment notes, which indicate that Plaintiff's mental status was normal during visits in April 2010, June 2010, August 3, 2010, and August 31, 2010. (T 390-94)   For example, Plaintiff reported improvements in his thought processes on June 3, 2010, stating that he no longer considered himself "cursed" and crediting Invega for helping him. (T 393) On August 3, 2010, Dr. Gleason observed that Plaintiff's medications were "working well" and that Plaintiff wanted to continue the same prescriptions. (T 391) Dr. Gleason assessed Plaintiff's Global Assessment Functioning ("GAF")[5] score at 50 during the August 3, 2010 visit, but Plaintiff's GAF score improved to 57 by his subsequent visit on August 31, 2010. (T 390-91)   Dr. Gleason then compiled the Psychiatric Impairment Questionnaire on September 27, 2010, noting that Plaintiff would be absent from work more than twice a month. (T 415)   When Plaintiff next saw Dr. Gleason again on October 28, 2010, his GAF score remained unchanged at 57.  (T 34, 423)

Plaintiff argues that GAF scores are not relevant, given that they "have no direct correlation to the severity requirements of the mental disorders listings." Wind v. Barnhart, 133 F. App'x. 684, 692 n.5 (11th Cir. 2005) (per curiam) (unpublished) (citations and internal quotation marks omitted). However, the ALJ did not err in referring to the GAF scores, among other evidence, in finding that

---

[5] A GAF score describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DSM-IV-TR at 34.  A GAF score of 41–50 indicates serious symptoms; a score of 51–60 indicates moderate symptoms; and a score in the range of 61–70 indicates mild symptoms. Id. at 32–34.

11

Plaintiff's condition had not changed markedly around the time that Dr. Gleason completed the Psychiatric Impairment Questionnaire. Plaintiff was alert, appropriately groomed, and oriented to time, place, and person in Dr. Gleason's mental status examinations before and after the questionnaire. (T 35, 390, 423)  During these visits, Plaintiff frequently denied command hallucinations or suicidal ideation. (Id.)  Given Plaintiff's improved status and ongoing response to medication, the ALJ properly found that Dr. Gleason's predictions about Plaintiff's absences from work were inconsistent with his own treatment notes. (Id.)

Although Plaintiff contends that the ALJ's reliance on the opinions of Dr. Levasseur was faulty as that physician had insufficient records at the time of his February 2010 review, this argument is also unpersuasive. Dr. Levasseur's findings referred to Plaintiff's June 2009 hospitalization, his subsequent treatment with Dr. Gleason, and a consultative psychological examination by Gerald Hodan, Ph.D. ("Dr. Hodan") in September 2009. (T 386) Plaintiff indicates that Dr. Levasseur did not have sufficient information from Dr. Gleason, who continued to treat Plaintiff through at least October 2010.[6] However, it does not appear that Dr. Gleason's notes after October 2010 differed significantly from his earlier records. In any event, the ALJ reviewed Dr. Gleason's findings after February 2010, referring expressly to Plaintiff's ongoing treatment from April through October 2010. (T 34-35) He also discussed records from March 2011 when Plaintiff was seeing a new medical provider. (T 34)  This shows that  the ALJ considered the record as a whole, and it was not error for the ALJ to rely on Dr. Levasseur's opinion.

Lastly, Plaintiff's contention that the ALJ failed to consider certain factors in evaluating Dr.

---

[6] Plaintiff testified that he started seeing a new provider after Dr. Gleason retired. (T 36, 61-62) In a treatment note dated October 28, 2010, Dr. Gleason stated that Plaintiff's next appointment would be with a "new medical provider." (T 423)

Gleason's opinions, such as the length and nature of the treatment relationship, is also without merit. See 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6) (2012) (enumerating factors). The ALJ is not required to expressly address each factor in assessing a treating physician's opinion. Lawton v. Comm'r of Soc. Sec., 431 F. App'x. 830, 833 (11th Cir. 2011) (per curiam) (unpublished). Instead, the ALJ must show good cause for rejecting the opinion of a treating physician. Id. (citation omitted). Here, the ALJ discussed inconsistencies between Dr. Gleason's opinions and other evidence of record, as well as inconsistencies within Dr. Gleason's own treatment notes. (T 35-36) Moreover, the ALJ stated that he evaluated the opinion evidence in accordance with the regulations, thereby acknowledging that he considered the relevant factors. (T 31)

Based on the foregoing, the ALJ articulated good cause for giving less credence to some of Dr. Gleason's opinions. Additionally, the ALJ was entitled to accord great weight to Dr. Levasseur's findings as a non-examining physician whose conclusions were supported by the record and consistent with the underlying clinical findings of the treating and examining physicians. See Flowers, 441 F. App'x at 742-43. Plaintiff is not entitled to relief on this issue.

**B.** Plaintiff contends the ALJ erred in not fully crediting Plaintiff's complaints of fatigue, suicidal ideation, and hallucinations. Additionally, he contends that the ALJ applied the wrong legal standard in making his credibility determination.

Subjective complaints are evaluated according to a three-part "pain standard" that is used when a claimant attempts to establish disability through testimony about pain or other subjective symptoms. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)(per curiam). A plaintiff must show: (1) objective medical evidence of an underlying medical condition; and either (2) the objective medical evidence substantiates the severity of the pain from the condition; or (3) the

objectively determined medical condition is of sufficient severity that it would reasonably expected to produce the pain alleged. Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986) (per curiam). If the ALJ does not credit a claimant's testimony regarding subjective complaints, the ALJ must "articulate explicitly and adequate reasons for doing so." Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995) (per curiam). A clearly articulated credibility finding that is substantially supported by the record will not be overturned. Id. at 1562 (citation omitted).

At the hearing, Plaintiff testified that he had severe depression, anxiety, a short temper, and severe fatigue. (T 65) He explained that his mental health problems became worse after he was assaulted in 2008 and suffered a head injury. (T 65-66) Plaintiff stated that his depression makes him feel so "bleak" that he cannot get out of bed at times. (T 68) He also explained that his medications cause fatigue, grogginess, and general nervousness. (T 74) While his medications "substantially" reduce his auditory hallucinations, Plaintiff testified that he still hears voices a few times a week. (T 70)

The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not credible" to the extent they were inconsistent with his RFC. (T 32)

Plaintiff contends that the ALJ applied the wrong legal standard because the ALJ used "boilerplate language" suggesting that the ALJ compared Plaintiff's testimony to the RFC and not to the evidence of record as required. (Dkt. 11 at 18)[7] However, the ALJ's credibility determination

---

[7] Plaintiff cites Seventh Circuit cases that have questioned the use of boilerplate language in an ALJ's credibility determination. See Bjornson v. Astrue, 671 F.3d 640, 645-46 (7th Cir. 2012). However, the Seventh Circuit has also found boilerplate language harmless when "the ALJ has

does not have to include any "particular phrases or formulations" as long as it provides enough explanation for the court "to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam) (citation and internal quotation marks omitted). See also Rivera-Gonzalez v. Astrue, No. 8:11–CV–172–T–30EAJ, 2012 WL 2912651, at *1 (M.D. Fla. July 16, 2012) (adopting report and recommendation that found no error where ALJ used boilerplate language but based credibility determination on inconsistencies between Plaintiff's testimony and the medical record). As the ALJ provided sufficient information to explain why he did not fully credit Plaintiff's allegations, this argument is without merit.

Specifically, the ALJ explained that he discounted Plaintiff's allegations because they were inconsistent with Dr. Gleason's treatment notes and, in some instances, Dr. Hodan's consultative examination. (T 32-34) Regarding fatigue, the ALJ noted that Plaintiff alleged severe fatigue at his examination by Dr. Hodan in September 2009, but he did not raise this issue in subsequent examinations. (T 32, 325) Additionally, when Plaintiff complained that Seroquel was making him sleepy in February 2010, Dr. Gleason took him off Seroquel and prescribed Invega. (T 396) In his visits thereafter, Plaintiff did not complain of fatigue[8] and denied all medication side effects on at least two subsequent occasions. (T 32, 391, 421) Plaintiff also denied suicidal ideation, hallucinations, or both during numerous examinations. (T 305, 315, 346-49, 351, 362, 364, 400, 390-91, 393-95, 398, 421, 423)

---

otherwise explained his conclusion adequately." Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).

[8] Plaintiff complained in June 2010 that Invega was causing weight gain. (T 393) This side effect does not appear to be a work-related limitation.

15

Beyond the treatment notes, the ALJ concluded that the overall record showed Plaintiff responded well to medication and made consistent improvement as evidenced by normal mental status examinations and stable GAF scores. (T 34)   As such, the ALJ articulated specific reasons for discounting Plaintiff's allegations about the limiting effects of his fatigue, hallucinations, and thoughts of suicide.  Substantial evidence supports the ALJ's credibility determination.  See Allen v. Sullivan, 880 F.2d 1200, 1202-03 (11th Cir. 1989) (per curiam).

Additionally, an ALJ must elicit testimony or make findings regarding the effects of prescribed medications on a claimant's ability to work. See Cowart v. Schweiker, 662 F.2d 731, 737 (11th Cir. 1981).  However, the ALJ is not obligated to credit a claimant's testimony regarding medication side effects if there is no evidence in the record of such complaints. See Turner v. Comm'r of Soc. Sec., 182 F. App'x 946, 949 (11th Cir. 2006) (unpublished) (per curiam).  Here, the ALJ discussed Plaintiff's testimony that his medications caused fatigue and noted that Plaintiff's physician altered his medication in February 2010 after Plaintiff complained that a higher dose of Seroquel was making him sleepy. (T 32)   But the ALJ also discussed the lack of complaints regarding fatigue thereafter and observed that Plaintiff denied any side effects on several occasions. (T 34, 35)   The ALJ considered Plaintiff's allegations of side effects and properly weighed the evidence.  Plaintiff is not entitled to relief on this basis.

**C.**   Plaintiff also claims that the ALJ relied on flawed VE testimony because the ALJ's hypothetical did not include all of Plaintiff's limitations.

In order for the VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question to the VE that includes all of a claimant's impairments. Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999) (citation omitted).  However, the ALJ is required to include only

16

limitations that the ALJ finds supported by evidence. See Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1161 (11th Cir. 2004). The "mere existence of [an] impairment[] does not reveal the extent" to which it limits a claimant's ability to work. Moore v. Barnhart, 405 F.3d 1208, 1213 n. 6 (11th Cir. 2005) (per curiam) (citation omitted).

Although Plaintiff does not explain which limitations should have been included in the hypothetical,[9] he appears to be referring to Dr. Gleason's findings that Plaintiff suffered repeated episodes of decompensation and would have to miss work more than twice a month. (See Dkt. 11 at 19) As already explained, the ALJ established good cause to reject Dr. Gleason's opinions on these topics. Because the ALJ posed a complete hypothetical[10] to the VE that included limitations

---

[9] Plaintiff's argument on this issue is confined to two paragraphs. (Dkt. 11 at 19) "Such a cursory treatment of a potentially important issue is taken by this Circuit to be a sign that the party has abandoned the argument." Callahan v. Barnhart, 186 F. Supp. 2d 1219, 1230 n.5 (M.D. Fla. 2002) (citations omitted).

[10] At the hearing, the ALJ initially posed a hypothetical to the VE that included medium, light, or sedentary work. (T 78-79) However, he subsequently modified the hypothetical to include only light work. (T 80) With the additional limitation of light work, the hypothetical was as follows:

> Let's assume that the individual should not be climbing ladders, ropes, or scaffolds as part of his job duties. We'll assume the individual could perform other postural activities frequently. That includes climbing stairs, stooping, kneeling, crouching. Let's assume the individual should have no concentrated exposures to hazards such as dangerous machinery or unprotected heights. We will assume for this hypothetical, the individual could perform on a regular and sustained basis with the customary work breaks once every two hours. We're going to assume that the individual should have no more than occasional interaction with the public as part of his job duties, that the general social interaction should be of a non-confrontational type, non-intensive, essentially superficial, casual. We're going to assume that the individual would be able to understand, carry out, and remember instructions, perform tasks at the unskilled to detailed, semi-skilled level but not the complex or skilled level, and that the individual could make simple, work-related decisions to detailed work-related decisions, not complex decisions and similarly respond to changes in the unskilled to semi-skilled work settings but not the more

supported by the record, the ALJ did not rely on flawed VE testimony in making his determination that Plaintiff could perform other jobs available in significant numbers in the national economy. Remand is unwarranted on this issue.

### III. Conclusion

For the foregoing reasons, the ALJ's decision is supported by substantial evidence and the proper legal principles. Accordingly and upon consideration, it is **RECOMMENDED** that:

(1) the decision of the Commissioner be **AFFIRMED** and the case **DISMISSED**, with each party to bear its own costs and expenses; and

(2) the Clerk of Court enter final judgment in favor of Defendant consistent with 42 U.S.C. §§ 405(g) and 1383(c)(3).

**Date:   August 7, 2013**

_____
ELIZABETH A JENKINS
United States Magistrate Judge

### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).

Copies to:

---

complex skill settings.

(T 78-79)

Counsel of Record
District Judge